William J. Dempsey, J.
This proceeding involving Kevin Robert Zwiebel, an infant born on November 30, 1968, was brought on by his foster mother, Mary Josephine Hoenig, pursuant to section 392 of the Social Services Law by order to show cause. The petition alleges, among other things, that the natural mother of the child is “both physically ill and mentally unstable,” and that the child is in “ imminent danger ” in the custody of the natural mother, Barbara Zwiebel. It asks that the Nassau County Department of Social Services and Barbara Zwiebel show cause why they should not be adjudged in contempt of an order of this court granted September 13, 1972 which continued the child in foster care, why the child should not be returned to his foster home and why foster care of the child should hot ,be continued.
The facts, as the court finds them, are as follows:
The infant, Kevin Robert Zwiebel was born November 30* 1968 out of wedlock, at Booth Memorial Hospital. His mother, Barbara Zwiebel, was then 16 years old and resided with her parents, Mr. and Mrs. Robert Zwiebel, at 684 Dorothea Lane, Elmoñt. Foster care for the child was requested prior to his birth. The maternal grandparents refused to have Kevin in their home, and the natural mother was unable to. take care of him independently of them. She surrendered Kevin voluntarily to the Department of Social Services, and he ¡was placed in the foster, home of petitioner, Mary Josephine Hoenig, then about 52 years of ¡age, residing at 2087 Oakme're Drive, Baldwin, N. T.
*367 on December 26, 1968. He resided there from that time until November 10, 1973. During this period of time, approximately five years, Kevin was properly cared for by petitioner, who grew deeply attached to him and desired to adopt him. Barbara Zwiebel did not at any time give up her interest in Kevin. From the beginning of his placement she visited him every month, or every other month. Under the rules 'of the Department of Social Services, she could have visited him twice a month. On the other hand she did not have an automobile, could not drive one, and was dependent upon her older sister to furnish her with transportation in order to visit her child at the outset. When she visited ,the child, visitation was limited to one or two hours, and confined to the residence of petitioner. Barbara Zwiebel was not permitted to take her child outside of his foster home. The reason for this, according to the Department of Social Services caseworker, was because “ Kevin is afraid to go outside right now with his mother.” Meanwhile, Mr. & Mrs. Robert Zwiebel, maternal grandparents of Kevin, became certified foster parents and had two foster children living with them. Nothing was done for a year and one-half leading up to September 13, .1972 by the Department of Social Services caseworker toward contacting Mr. & Mrs. Zwiebel for the purpose of seeking to persuade them to have Kevin reside in their home. During the period January 1, 1969 and September 13, 1972 Barbara. Zwiebel gave birth to two more children out of wedlock, and gave them up for adoption by instrument of permanent surrender. She continued to visit with Kevin.
On September 13, 1972 the matter of Kevin Robert Zwiebel came up for foster care review as required by section 392 of the Social Services Law. At the hearing, Barbara Zwiebel, Mary Hoenig, and the then Department of Social Services caseworker, Candy Knoblock, were present. At the conclusion of the review, which this court considers part of the record of this case, the court said: “ There is absolutely no reason why this lady can’t see her child away from his residence. This is not a ease where she was out of the life of this child for five years where he has not seen his mother. He has seen her once a month, or once every other month. If he is afraid of his own mother, it should be investigated. That is not natural. Also, it does not present itself as any kind of adoptive situation. If his ties are getting too deep in the Hoenig household something should be done about it so that the child doesn’t get torn apart. ’ ’ The hearing concluded with the following direction by the court: “ At the present time, the Court feels that the best interest of the child dictates that *368 an order simply be entered under section 392-2 a, directing that foster care of the child be continued. ’ ’ Following the court review of foster care in September of 1972, Barbara Zwiebel continued to visit with Kevin on a regular basis. Her mother permitted her the use of an automobile. She was now 20 years old and could drive herself, to effectuate visitation. Visitation was now permitted away from the foster home. It was limited to one to two hours, and the ¡caseworker Mrs. Knoblock instructed Barbara Zwiebel not to take the child to the home of her parents, Mr. & Mrs. Robert Zwiebel. In November, 1972 (Barbara Zwiebel began to take Kevin to her parents’ home at 684 Dorothea Lane, Elmont, and continued this practice into 1973, during her one-to two-hour period of visitation.
In February, 1973 the caseworker of the Department of Social Services in charge of Kevin Zwiebel’s case was changed. Mrs. Rose Rimland was substituted for Mrs. Candy Knoblock. Mrs. Rimland had difficulty establishing a relationship with Barbara Zwiebel who expressed resentment because the previous caseworker Mrs. Knoblock wouldn’t let her take Kevin to her home. On ¡March >6,1973 Mrs. Rimland visited Mrs. Hoenig and advised her that the foster care of Kevin was only temporary. Mrs. Hoenig expressed a desire to adopt the child and did not think the child should return to his family. About Mdrch 15, 1973 Mrs. Rimland visited Barbara Zwiebel at her home and set up a schedule of visitation for her on March 29, April 5, and April 26, ,1973. These visits were canceled out by Barbara Zwiebel who told Mrs. Rimland she did not want her present when she visited Kevin. She wanted to see him alone, pick him ,up by herself, and plan for him by herself. Mrs. Rimland then advised Barbara Zwiebel to make her own arrangements for visitation, and scheduled visits for her on May 10, and 24, June 14 and 28, July 12, and 26, August 9, and 23, 1973. On May 14th, Mrs. Rimland spoke to Mrs. Hoenig about the visitation, and Mrs. Hoenig said she was very busy but would try ¡to spare time for this. On August 1, 1973 Mrs. Rimland visited Barbara Zwiebel at her' residence in Elmont. Barbara was pleased that Kevin was visiting at her home. She said he had seen his grandmother and grandfather, had played with the children outdoors, and enjoyed being in the Zwiebel home. Kevin visited there on May 10, and May 24, June 14, July 12, August 9 and 23, 1973. On September 12, 1973 Mrs. Rimland visited the Zwiebel residence with Mrs. Zwiebel and Barbara present to inspect the physical layout and sleeping quarters. There were three levels including a finished family room in the base *369 ment. There was a living room, dining room, kitchen, two bedrooms, one of them a master bedroom on the main level. On the upper level there were two bedrooms, one finished one unfinished. Residing there were a daughter Donna 12 years old a son Kevin eight years old (daughter and son of Mr. & Mrs. Robert Zwiebel), Mr. & Mrs. Robert Zwiebel, three foster children, and Barbara Zwiebel.
On September 21, 1973 Mrs. Rimland visited Mrs. Hoenig. Barbara Zwiebel was there for visitation. Mrs. Hoenig spoke to Barbara Zwiebel about her future plans and asked her how could she go on public welfare. Barbara Zwiebel told Mrs. Hoenig that was her own business and if she didn’t like it “ she could stick it up her ass. ’ ’ Barbara was upset and ran outside the home. Mrs. Hoenig was upset, and Kevin was crying. Mrs. Rimland went out and told Barbara to control herself, then went inside. Mrs. Hoenig ¡did not want Kevin to go on visitation. Mrs. Rimland spoke directly to Kevin. He said he wanted to have the visitation, and to have a snack. Mrs. Rimland took Kevin out to the car. Mrs. Hoenig isaid the child would be mistreated, slammed around, and have his clothes torn. Later that day, Mrs. Rimland visited the Zwiebel residence. Kevin was there, he was playing with children. He came in and went out several times and appeared to be having a good time. On September 21, 1973 when Kevin visited at the Zwiebels, Mrs. Hoenig had expressed fears that Kevin would not be returned to her. Mrs. Rimland telephoned her that night. Mrs. Hoenig said the child had come home and she was relieved. Kevin was in good condition and she was glad to ¡have him back.
On October 9, 1973 Mrs. Rimland visited Mr. Zwiebel at his home. Barbara and Mrs. Zwiebel were present. Mr. Zwiebel said he was now ready to have the child live with him, that he xwas a beautiful grandchild and he would be glad to have him. Mrs. Rimland told him that the department was working toward the return of the child, and that she wanted to explore the whole area. The Zwiebels told her they would work with her. On October 26, 1973 Mrs. Rimland received a telephone call from a man who identified himself as an Assemblyman, and who wanted to know why Kevin was being returned to his natural parent when the foster parent was opposed to it. Mrs. Rimland requested him to take the matter up with higher headquarters. On October 26,1973 Mrs. Rimland visited Mrs. Hoenig and told her Kevin would be returned to his home in the near future, that she had evaluated ¡the entire area and that the child was wanted by his parent, and grandparents. Mrs. Rimland ten *370 dered Mrs. Hoenig a ten-day notice form of which she had advised her in ¡September. Mrs. Hoenig first refused it, but at a subsequent time took it. The department had not yet arrived at a final date for the return of Kevin to his natural mother. On October 31, 1973 Mrs. Rimland visited 'Barbara Zwiebel after having seen Doctor Robert H. Di-addy, Barbara Zwiebel’s physician. He had given Mrs. Rimland a statement that Barbara was an emotionally healthy girl, and Barbara was pleased with the findings. On 'November 2, 1973 Mrs. Rimland telephoned Mrs. Hoenig and requested to take Kevin for ice cream and talk to him. Mrs. Hoenig told her to do it in her home. Mrs. Rimland asked Kevin about returning to his mother. Kevin expressed fears about a new school situation. Mrs. Rimland told him the teacher would work with him, but Kevin said he would only be happy in the Baldwin school.
On Saturday, November 10, 1973 there was a scheduled visit for Barbara Zwiebel with her son Kevin. This was to extend from 11:00 a.m. to 4:00 p.m. Barbara Zwiebel picked Kevin up as scheduled; took him to her home at 684 Dorothea Lane, Elmont; and has kept him in her custody up to the present time. On Monday, November 12, 1973 Mrs. Rimland learned that Kevin had not been returned to Mrs. Hoenig following visitation on Saturday. She telephoned Barbara Zwiebel who advised her she was not going ¡to return Kevin to his foster home. Mrs. Rimland visited the Zwiebel home at 11:00 a.m., and spoke to Barbara and Mrs. Zwiebel. Kevin was there. Barbara said ¡the reasons why she would not return Kevin were because she felt that tensions were mounting, and that she would never get the child home; she felt that there would be a court battle, and ¡she would be kept from having Kevin home. Mrs. Rimland asked Barbara Zwiebel how the child had reacted. She said that Kevin was upset when he learned he would not return to his foster home. He sat in a play tire and would not join the family for dinner. Barbara went to him. He then took her hand and ate dinner. Mrs. Rimland observed Kevin during her visit of November 12th, He had tear streaks down his face. He told her he had come to live with his grandparents and his mother. He was quiet. He was wearing girl’s pants with no fly and an old polo shirt. Barbara Zwiebel said they were the clothes he was wearing when he came home. Later, on November 12th, Mrs. Rimland drove Barbara and Kevin to the Department of Social Services office where she was interviewed by supervisor iMrs. Ruth Fowkes. Barbara Zwiebel told Mrs. Fowkes the situation was too tense; that she could *371 not wait any longer; that she was being short changed; that she couldn’t take the child out; that she had to sit in the foster mother’s presence and couldn’t understand why she couldn’t have the child on his birthday; that she felt she had to take him home. Mrs. Eimland telephoned Mrs. Hoenig and told her she had seen Barbara and Kevin and that Kevin was all right and was being given the best of care. Mrs. Hoenig requested to see Kevin, and Mrs. Eimland told her the child needed time to adjust to the home. Mrs. Hoenig hung up.
On November 19,1973 Mrs. Eimland visited the Zwiebel home. She found Kevin more outgoing and more at ease. He was playing with some toys and with other children. He was not attending school. Mrs. Zwiebel and Barbara wanted him to be adjusted to the home situation before he went to school. On November 21,1973 Mrs. Eimland again visited the Zwiebel home. Kevin met her with a smile and asked Mrs. Zwiebel for some bread and butter. He appeared happy and comfortable. On November 28,1973 Mrs. Eimland visited the Zwiebel home again. Kevin appeared happy and at ease. He threw the ball; ran and got it; and played with a child named Marie. Mrs. Eimland visited the Zwiebel home on December 5, 14, 19, 1973 and on January 18, 30, February 19, and 26, 1974. During this period Mrs. Eimland concluded that the child, Kevin, had become a part of the Zwiebel family. He threw his arms around his mother, and said “ I love you,” jumped into her lap and seemed to know his mother much better. His grandfather took him out. Kevin was ¡enrolled in school on December 17, 1973 in Elmont, and has been an enrolled student since that time. Mrs. Eimland talked to Kevin on March 13,1974, he appeared happy, showed her his papers, .and told her he enjoys school and likes to go there every day. On December 27, 1973 Mrs. Marjorie Mellish, Assistant Director of the Children’s Bureau of the Department of Social Services, visited the Zwiebel home. Kevin’s case had been under her jurisdiction since June, 1973. She spoke to Mrs. Zwiebel, Barbara and the children. The children appeared ¡to be happy .and well fed. Kevin came to her and asked her if she would like to see the bicycle he received for Christmas. Mrs. Zwiebel advised her that Kevin shared a room with his eight-year-old uncle, Kevin (Mrs. Zwiebel’s son). They have twin beds and room on the first floor. On March 15, 1974 during the hearing on this order to show cause, this court conferred with the child, Kevin, who is the subject of this proceeding, in the privacy of chambers. Present were the court, Kevin, and a court reporter. In substance, Kevin advised the *372 court that he likes his new school, that he likes living with the Zwiebels, and that he wishes to remain with his mother, Barbara Zwiebel.
(a) There is no substantial evidence to .support the allegation that Barbara Zwiebel is both physically ill and mentally unstable, or unfit to have custody of the child Kevin, or that he is in imminent danger. There is no evidence that she is a drunkard, or that she uses narcotic or dependency drugs. There is no evidence of bizarre behavior on her part at any time during the past five years. Nor is there any evidence of cruelty, viciousness, indifference, or carelessness in the treatment of the child, Kevin, during such time as he has been with his mother. It is true that Barbara Zwiebel’s education only extended through three years of high school, and that her employment record is sporadic. It is also true that she has had two other children born out of wedlock. If these criteria determined fitness to exercise custodial care of children, foster care case numbers would be greatly multiplied. This court is of the opinion that the allegations relating to the unfitness of Barbara Zwiebel to have her son, Kevin, in her custody are not sustained by the evidence. There is also no substantial evidence of abandonment, or intention to abandon the child, Kevin, on the part .of his natural mother. On the contrary she has persisted in her efforts to maintain the maternal relationship and contact with Kevin despite refusals by her parents to have him, inability to drive a car, or have one, extreme youth and immaturity, .successive and ineffectual social service case workers (excepting Mrs. Bose Bimland), and the reluctance to co-operate with her on visitation of a foster mother who became deeply attached to the child.
(b) Treating this now as a review of foster care case, as requested in the order to show cause pursuant to the provisions of section 392 of the Social Services Law, the court concludes that the best interest of the child, Kevin Zwiebel, will be served upon all the facts and circumstances herein, if he is discharged by the Department of Social Services to the custody of his natural mother.
(c) On September 13, 1972 this court directed that foster care of the child, Kevin Zwiebel, be continued. Petitioner herein requests that the Department of Social Servios and Barbara Zwiebel be adjudged in contempt of court for disobedience of the court’s order. At the outset this court concludes that the Department of Social Services did not in any way disobey this court’s order of September 13, 1972. Mrs. Bose Bimland was the immediate agent and social worker of the Department of *373 Social Services at the time Barbara Zwiebel took her son, Kevin, on ¡November 10, 1973 and failed to return him to his foster home. There is no evidence that she, or anyone else, in the Department of Social Services induced, persuaded, or encouraged Barbara Zwiebel to keep the child, Kevin, before or during the time the act occurred, or that she or anyone else in the department agreed and conspired with the natural mother, in the taking and keeping of the child before or during the time the act occurred. The act of keeping Kevin beyond visiting hours was committed solely by the natural mother, Barbara Zwiebel.
There is another aspect to the question of contempt as it concerns the department of social services. Subdivision 2 of section 383 of the Social Services Law provides: “The custody of a child placed out or boarded out and not legally adopted or for whom legal guardianship has not been granted shall he vested during his minority, or until discharged hy such authorised agency from its care and supervision, in the authorised agency placing out or boarding out such phild and any such authorized agency may in its discretion remove such child from the home where placed or boarded. ’ ’ (Emphasis supplied.)
A direction by the court under section 392 (subd. 7, par. [a]) of the Social Services Law that foster care of the child be continued simply continues to vest custody of the child in the authorized agency. It does not vest custody of the child in the foster parents to the exclusion of the agency. This would completely remove the child from under the multi-faceted responsibility of the authorized agency. The court looks to the many resources, professionalism and continuous responsibility bf the agency for the safekeeping of the child during temporary foster care, not to the foster parents. Thus, when Barbara Zwiebel continued to keep the child, Kevin, she was keeping him from the custody vested in the authorized agency by the court, not the custody of the foster mother, Mrs. Hoenig. The agency was not relinquishing its responsibility as .vested custodian of the child during the time the child was kept by his mother. It had the authority to seize the child and continue him in the temporary care of Mrs. Hoenig, and it had the authority to leave him in the care of his own mother subject to seizure, if in the judgment of the agency it would serve the best interests of the child, or the mother was unable to properly care for the child. The agency did not at any time formally discharge custody of Kevin from its care and supervision to that of his mother. Mrs. Rimland visited the child at the Zwiebel *374 home, on a weekly basis after he was kept by his mother, and Mrs. Mellish, the assistant director of the children’s bureau visited him there on December 27, 1973. The visits continued up to the present hearing. This careful and responsiblé conduct by the Department of Social Services cannot be construed to be contemptuous of the court’s order continuing the child in foster care pursuant to section 392 (subd. 7, par. [a]) of the Social Services Law.
When section 392 of the Social Services Law was originally presented in 1970 by Assemblyman Pisani, it was accompanied by an expression of intent as follows: “Social Services Law, § 392, ¡new. Adds a new section which requires court approval to keep a child in foster care status beyond the period of 24 months. The purpose is to facilitate the release of foster children for adoption or the early resumption of their natural home environment.
‘ ‘ Foster care was established as a temporary measure to care for children, while the parents were being rehabilitated. Unfortunately, it has become the way of life for thousands upon thousands of homeless children * * * Perhaps, with the passage of' this Canadian Law, more parents will reassume their parental roles. The welfare of the child must be paramount, for they are America’s future.” (New York State Legislative Annual, 1970, p. 32.)
Section 392 of the Social Services Law should not be construed to perpetuate foster care, or to handcuff the Department of Social Services in attempting to carry out the spirit of the law.
Another 'consideration of the application to adjudicate contempt by the natural mother, and the Department of Social Services is contained in the provisions of section 392 of the Social Services Law, and section 156 of the Family Court Act. Subdivision 7 of section 392 of the Social Services Law terms the order to be entered at the conclusion of the hearing as “an order of disposition.” Section 156 of the Family Court Act specifically provides for contempts as follows: “ The provisions of the judiciary law relating to civil and criminal contempts apply to the family court, except that the family court may not treat a violation of any order of disposition by a party to a proceeding in the family court, as a civil or criminal contempt, unless specifically empowered to do so under this act.” The Family Court Act does not specifically empower the court to treat a violation of an order of 'disposition under section 392 of1 the Social Services Law as a civil or criminal contempt. This appears to negate any adjudication of contempt, not only *375 against the Department of Social Services, but the natural mother as well.
The court does not approve, or condone the method used by the natural mother to regain custody of her son, but does not believe it was done as a willful or contumacious act of disobedience to the court order. It was more the act of a mother who was extremely anxious to regain custody of her child.
For the reasons . expressed above, all applications sought herein are denied, excepting the application for foster care review, and the Department of Social Services is directed to discharge the custody of Kevin .Robert Zwiebel to his natural mother, Barbara Zwiebel.